# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**THOMAS J. TRAURING**
Kokomo, Indiana

ATTORNEY FOR APPELLEE:

**JEFFRY G. PRICE**
Peru, Indiana



FILED

Jun 18 2012, 9:49 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| PERU SCHOOL CORPORATION a/k/a PERU COMMUNITY SCHOOLS, | ) ) ) |
| Appellant-Defendant, | ) ) |
| vs. | ) No. 52A04-1107-PL-352 ) |
| GARY GRANT, | ) ) |
| Appellee and Cross-Appellant/Plaintiff, | ) ) |
| vs. | ) ) |
| PERU SCHOOL CORPORATION a/k/a PERU COMMUNITY SCHOOLS, | ) ) ) |
| Appellant and Cross-Appellee/Defendant, | ) ) |
| and | ) ) |
| STANLEY HALL, | ) ) |
| Cross-Appellee/Defendant. | ) |

APPEAL FROM THE MIAMI SUPERIOR COURT
The Honorable A. Christopher Lee, Special Judge
Cause No. 52D01-0906-PL-188

**June 18, 2012**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Gary Grant was a school-bus driver with a yearly contract and an at-will custodian for Peru School Corporation a/k/a Peru Community Schools (hereinafter, "Peru Schools") for nearly twenty-four years. After being terminated during the 2007-08 school year, Grant filed a complaint for wrongful termination. Following a jury trial in which the jury found in favor of Grant and awarded him nearly $175,000 in damages, Peru Schools now appeals the trial court's denial of its motions for summary judgment and judgment on the evidence and the trial court's admission of evidence regarding Grant's salary as a school-bus driver and a custodian until he turns sixty-five years old.

We conclude that the trial court erred in denying Peru Schools' motion for judgment on the evidence as it pertains to Grant's employment as an at-will custodian because there is no substantial evidence of detrimental reliance, which is required to defeat the presumption of at-will employment. However, we reach a different result regarding Grant's employment as a contracted school-bus driver. Because there is a genuine issue of material fact as to why Grant was fired, Grant denies one of the two grounds, and cause is required in order to terminate an employee with a contract for a definite term, we conclude that the trial court properly denied Peru Schools' motion for summary judgment and left the matter for the jury to resolve. As for damages, because an employee discharged in breach of an employment contract for a definite term is entitled to recover his or her salary for the balance of the term, we conclude that Grant is only entitled to $2422.82 in damages, which represents the rest of his salary as a school-bus driver for the 2007-08 school year minus the unemployment compensation he

2

received. Because of our resolution of the above issues, we do not need to reach the merits of the issues raised in Grant's cross-appeal. We therefore affirm in part, reverse in part, and remand.

**Facts and Procedural History**

Peru Schools is an Indiana public-school corporation in Peru, Indiana. From 1983 to 2007, Grant was employed by Peru Schools in two capacities: (1) a school-bus driver under a yearly contract and (2) a full-time, at-will custodian. Grant received a letter each year from the Peru Schools superintendent thanking him for his services "as a bus driver" and providing "reasonable assurance" that he would be employed for the upcoming school year. Ex. 13. Grant received such a letter on May 18, 2007, for the 2007-08 school year. *Id.* Grant then entered into a School Bus Driver's Employment Contract for the 2007-08 school year. This contract provides, in relevant part:

> In consideration of the agreements hereinafter contained, Driver agrees to drive a school bus furnished by the Employer over a designated route or routes established by the Employer in and for said school corporation during the school year beginning AUGUST 15, 2007, consisting of 9 1/2 months, and continuing until MAY 28, 2008 . . . .
>
> \* \* \* \* \*
>
> 13. *This contract incorporates by reference all present policies of the School Corporation with respect to the transportation of students and passengers and are hereby made part of this contract.*
>
> \* \* \* \* \*
>
> 15. *Failure of Driver to comply with the terms of this contract, including all terms and conditions incorporated by reference, shall be deemed cause for dismissal at the option of Employer.* In the event of such breach by Driver, Employer's authorized agent shall first recommend dismissal to Employer's Governing Body, which may act upon such recommendation without notification or opportunity for Driver to be heard, but such dismissal shall

not be effective until the Governing Body takes action on such recommendation. Notwithstanding the above, Employer, acting by its authorized agent, may suspend Driver immediately, for any conduct or omission constituting cause for dismissal, pending actual dismissal.

Appellant's App. p. 20-21 (emphases added).

The Bus Drivers Handbook, which was incorporated by reference into the School

Bus Driver's Employment Contact, provides in relevant part:

RULES AND REGULATIONS

\* \* \* \* \*

6. No school bus driver shall permit any other person to drive their school bus, occupy the driver[']s seat, tamper with the engine/any controls, [or] tamper or use the 2-way bus radio except such persons who are authorized by the School Board or proper school authorities.

\* \* \* \* \*

BUS PARKING

\* \* \* \* \*

3. When buses are parked at locations other than S&S (Blair Pointe or the high school) care must be taken to secure the buses. If [the] bus is equipped with vandal locks they must be used, the emergency exits and service door must be secured. If the bus is not equipped with vandal locks the bus must be made secure as possible and KEYS REMOVED.

*Id.* at 189, 196.

Grant was assigned Bus 18, which was owned by Peru Schools and equipped with

two video cameras. Peru Schools paid for the bus fuel and maintenance. Grant parked

the school bus at his house when it was not in use. In November 2007, Grant reported

vandalism to a bus seat. Stanley Hall, Director of Finance and Operations for Peru

Schools, and David Frushour, Transportation Director for Peru Schools, reviewed the video from Grant's bus.

On November 20, Grant was called to Hall's office; Frushour was also there. Hall and Frushour told Grant that the video showed that for three consecutive days during the week of November 12, the bus was started around 4:45 a.m., which meant that it was running for about one and a half hours before Grant even began his route. Because of the placement of the cameras and the darkness, however, it could not be determined who started the bus. Hall and Frushour showed the video to Grant,[1] but Grant denied starting the bus that early because he was still asleep. Grant did not know how the bus was started so early. Grant, however, told Hall and Frushour that he did not secure the bus and left the keys in the bus every night. After Grant left the meeting, Hall and Frushour concluded that Grant had been starting the bus around 4:45 a.m. to waste fuel because he was not assigned extra trips and, therefore, Grant was untruthful in his answers. *Id.* at 150.

Hall and Frushour then met with the superintendent, Dr. Andrew Melin, and showed him the video. Dr. Melin confirmed that the bus was "started much earlier than normal and the bus was left running for a long period of time." Tr. p. 223. Dr. Melin had a "grave concern" about the situation because the bus was on Grant's property and Grant was the only one who had keys, yet Grant had no explanation for how the bus was started one and a half hours before his route began. *Id.* at 224. Dr. Melin likewise concluded

---

[1] The video was lost after the meeting and therefore was not shown to the jury at trial. Frushour's computer crashed, and the video could not be retrieved by Peru Schools' IT Department. Grant has never disputed that the video showed that the bus was started around 4:45 a.m. on those three days.

that Grant was being untruthful. Dr. Melin agreed that Grant should be suspended pending termination by the school board. *Id.* at 225.

That same day, November 20, Grant received a letter from Hall stating that "[a]fter consideration of the facts that were reviewed with you this morning you are hereby suspended from your duties as a bus driver and custodian pending board action on November 26, 2007. I will be recommending the termination of your employment with Peru Community Schools." Appellee's App. p. 139. Hall and Frushour drove to Gary's house and took the bus. Hall later called Grant to explain the letter.

The school board held an executive session on November 26. Dr. Melin, members of the school board, and the school board's attorney were present. One of the two purposes of the executive session was to "discuss, prior to any determination, that individual's status as an employee, student, or independent contractor who is a physician." Appellant's App. p. 64; Appellee's App. p. 108. A public session immediately followed. Grant was present at the public session, during which Dr. Melin recommended terminating Grant's employment as a school-bus driver and a custodian immediately. Appellant's App. p. 69. No reason was given for the termination during the public session. The board voted four to two to terminate Grant's employment with Peru Schools. *Id.*

On November 27, Dr. Melin sent Grant a letter stating that the school board "voted to terminate your employment with the Peru Community School Corporation effective Tuesday, November 27, 2007." *Id.* at 66.

6

On November 28, Hall prepared a memorandum at the direction of Dr. Melin. The memorandum summarizes the facts leading up to Grant's termination. The memorandum provides, in part:

> Mr. Gary Grant arrived at approximately 9:15 a.m. "What have I done now?" he asked when he entered my office. Mr. Frushour showed him the recording of the bus being started two hours before his route began and explained the 3:41 a.m. time stamp was actually 4:41 a.m. Gary said he did not know how the bus could be running at that time because he does not get up until 5:30 a.m. Gary admitted that he started the bus early, but not that early. Mr. Frushour reminded him that the bus was equipped with a pre-heater that only requires 15 minutes to warm up. Gary said he . . . knew that and turned off the pre-heater after the bus warmed up. Mr. Frushour told him the pre-heater is to be left on.
> We then discussed how someone other than Gary could start the bus at 4:41 a.m. Gary said he leaves the keys in the bus. Mr. Frushour told him to not do that anymore. I asked Gary who could be starting the bus. He did not know. I stated that if someone was starting a diesel bus in his driveway he should be hearing that. Gary said that he could not hear the bus running even if he was in the kitchen. I asked Gary, "Didn't you notice that the bus was running when you went out to start the bus?" He had no answer.
> Mr. Frushour directed Gary not to leave the keys in the bus and not to start the bus until 15 minutes before the beginning of his route at 6:45 a.m. Gary left the building.
>                          * * * * *
> Gary is a full-time custodian and part-time bus driver. Therefore, his rate of pay is higher for driving than other drivers due to over-time requirements. Because of that Gary is not being assigned for extra trips because it is less expensive to use other drivers. Mr. Frushour said that Gary had been in to see him more than once to complain about not being able to get those assignments. Mr. Frushour believed that was the motive for Gary wasting fuel to cost the corporation money that Gary should have been getting.
> It was our conclusion that Gary had been starting the bus between 4:41 a.m. and 5:05 a.m. unnecessarily to waste fuel and that he had not been truthful in denying that he did not start the bus that early. Mr. Frushour said, "If it was up to me I would fire him." I told him that the school board would have to take action for that to happen. We could suspend him from working until the board took action on November 26th.
>                          * * * * *
> At approximately 4:45 p.m. on November 26th I called Gary and offered him the opportunity to resign. He said he did not understand why

7

> he was being fired because he never lied to me or the administration. He said he would be at the board meeting with his attorney.

*Id.* at 149-50.

Grant filed for unemployment. When Hall filled out information for the Indiana Department of Workforce Development in December 2007, he said that Grant was discharged because he "[d]id not secure the bus when it was parked at his home" in violation of the handbook. Ex. 9. Grant received six weeks of unemployment totaling approximately $1800. Tr. p. 75-76.

Grant filed a complaint against Peru Schools[2] in June 2009. Grant alleged that he was wrongfully terminated as a school-bus driver and a custodian. Grant sought discovery of the information that was presented during the school board's executive session; however, Peru Schools claimed such information was privileged and did not turn it over. Grant then filed a motion to compel, which the trial court denied as follows:

> In making the denial, the Court finds that the plaintiff is seeking information concerning an executive session of the Board of Trustees, of the Peru School Corporation, that was held on, or about, November 26, 2007. Indiana Code 5-14-1.5-6.1(b), specifically allows executive sessions to discuss an individual's alleged misconduct or to discuss an individual's status as an employe[e], including that of an independent contractor who is a school bus driver. It is clear to the Court that the legislature specifically created the executive session exception to cover circumstances such as the one presented in this case.

Appellee's App. p. 20.

---

[2] Grant named Hall as a defendant, but the trial court granted Peru Schools' motion for judgment on the evidence and dismissed Hall as a defendant based on Indiana Code section 34-13-3-5. Appellant's App. p. 403. We affirm this ruling by the trial court.

Peru Schools filed a motion for summary judgment the following June. A hearing was held, following which the trial court denied Peru Schools' motion for summary judgment:

> (2) Peru School Corporation's Motion for Summary Judgment as it concerns Gary Grant's employment contract as a bus driver is **DENIED.**
>
> (3) Peru School Corporation's [Motion] for Summary Judgment as it concerns Gary Grant's claim for wrongful termination as a school custodian is **DENIED.**

Appellant's App. p. 12. Peru Schools did not seek an interlocutory appeal.

A three-day trial was held in the summer of 2011. Exhibit 14 was introduced during Grant's testimony. Exhibit 14 is a calculation of Grant's damages based on his salary as a school-bus driver and a custodian for the remainder of the 2007-2008 school year through the 2020-21 school year, which is when Grant will turn sixty-five years old. Grant calculated his lost wages for both jobs to be $534,799.86. *Id.* at 441-42. Peru Schools objected on grounds that Grant improperly calculated his damages, but the trial court admitted the exhibit and related testimony.

At the conclusion of Grant's case in chief, Peru Schools orally moved for judgment on the evidence. Peru Schools followed up with a written motion at the close of the evidence. The trial court granted in part and denied in part Peru Schools' motion. Specifically, the trial court ruled:

> 2. AT WILL EMPLOYEE/THREE EXCEPTIONS: The Court DENIES Defendant Peru School Corporation's motion for judgment on the evidence as whether, or not, the Plaintiff has established one of the recognized exceptions to the employment at will doctrine. It appears that the Plaintiff is only asserting the promissory estoppel exception. If the Court's presumption is inaccurate, further ruling will be made on the other two exceptions specifically.

9

3. MEASURE OF DAMAGES: The Court DENIES Defendant[']s request for judgment on the evidence as it concerns the measure of damages.

\* \* \* \* \*

6. OPEN DOOR VIOLATION: The Court GRANTS Defendant Peru School Corporation's request for judgment on the evidence as it concerns the claim that Defendant Peru School Corporation violated the Open Door Law. The Court specifically finds that no evidence was presented supporting this claim or from which any reasonable inference could be made in support of the claim.

*Id.* at 402-03.

The jury ultimately found in favor of Grant and awarded him $171,082.69 in damages.

Peru Schools appeals, and Grant cross-appeals.

**Discussion and Decision**

**I. Peru Schools' Appeal**

Peru Schools raises several arguments on appeal. Peru Schools contends that the trial court erred in denying its motions for summary judgment and judgment on the evidence regarding termination of Grant's employment as a school-bus driver and a custodian. Peru Schools also contends that the trial court erred in admitting evidence of Grant's claimed damages for more than twelve years after his termination.

When reviewing the entry or denial of summary judgment, our standard of review is the same as that of the trial court: summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269 (Ind. 2009). All facts established by the designated evidence, and all

10

reasonable inferences from them, are to be construed in favor of the nonmoving party. *Naugle v. Beech Grove City Sch.*, 864 N.E.2d 1058, 1062 (Ind. 2007).

The standard of review on a challenge to a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision. *State Farm Mut. Auto. Ins. Co. v. Noble*, 854 N.E.2d 925, 931 (Ind. Ct. App. 2006), *trans denied.* Judgment on the evidence is proper where all or some of the issues in a case tried before a jury are not supported by sufficient evidence. *Id.* A party may move for such judgment on the evidence after the plaintiff's case in chief or after all the evidence in the case has been presented and before judgment. Ind. Trial Rule 50(A). We will examine only the evidence and the reasonable inferences that may be drawn therefrom that are most favorable to the non-movant, and the motion should be granted only where there is no substantial evidence to support an essential issue in the case. *Noble*, 854 N.E.2d at 931. If there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper. *Id.*; *see also* T.R. 50(A).

*A. Custodian*

The trial court denied Peru Schools' motion for summary judgment and motion for judgment on the evidence regarding termination of Grant's employment as a custodian. Because we conclude below that the trial court erred in denying Peru Schools' motion for judgment on the evidence regarding termination of Grant's employment as a custodian, we do not address this issue using the summary-judgment standard.

Grant did not have a contract for his job as a custodian. Indiana follows the doctrine of employment at will, which means that employment of indefinite duration may

11

be terminated by either party at will, with or without reason. *Baker v. Tremco Inc.*, 917 N.E.2d 650, 653 (Ind. 2009); *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 121 (Ind. 1994), *reh'g denied*. "The presumption of at-will employment is strong, and [the Indiana Supreme Court is] disinclined to adopt broad and ill-defined exceptions to the employment at will doctrine." *Baker*, 917 N.E.2d at 653.

In fact, our Supreme Court has recognized only three exceptions to this doctrine. *Id.* First, if an employee establishes that "adequate independent consideration" supports the employment contract, the Court generally will conclude that the parties intended to establish a relationship in which the employer may terminate the employee only for good cause. *Id.* at 653-54. "Generally, simply surrendering another job or moving to another location to accept a new position which the employee sought, standing alone, does not constitute adequate independent consideration." *Orr v. Westminster Village N., Inc.*, 689 N.E.2d 712, 718 (Ind. 1997). Adequate independent consideration is provided, however, when the employer is aware that the employee had a position with assured permanency and the employee accepted the new position only after receiving assurances guaranteeing similar permanency, or when the employee entered into a settlement agreement releasing the employer from liability on an employment-related claim against the employer. *Id.*; *see also Baker*, 917 N.E.2d at 654.

Second, our Supreme Court has recognized a public-policy exception to the doctrine if a clear statutory expression of a right or a duty is contravened. *Baker*, 917 N.E.2d at 654.

Third, our Supreme Court has recognized that an employee may invoke the doctrine of promissory estoppel by pleading the doctrine with particularity, demonstrating that the employer made a promise to the employee, the employee relied on the promise to his detriment, and the promise otherwise fits within the Restatement test for promissory estoppel. *Id.* The Restatement provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1) (1981); *see also Jarboe*, 644 N.E.2d at 121 (adopting this Restatement section).

Grant relied on the third exception to the employment-at-will doctrine, promissory estoppel. Grant argued that for over twenty-four years, he received letters from Peru Schools thanking him for his services "as a bus driver" and providing "reasonable assurance" that he would be employed for the upcoming school year. Ex. 13. All the letters were similarly worded. For example, the May 18, 2007, letter provides:

Dear Mr. Grant,

> The administration and Board wish to thank you for your services as a bus driver during the 2006-07 school year.

> You may accept this letter as reasonable assurance that you will be employed for the 2007-08 school year, for such periods as are established in the school calendar and in accordance with your job classification or a similar classification. Your classification is one of less than twelve months employment.

> The Board of School Trustees reserves the right to alter or eliminate any or all positions within this classification, prior to and during the next

13

school year.  Notice to the employee, in the event there are position or classification changes, will be given by the employer.

Again, thank you for your services.  Enjoy your summer.

*Id.*[3]  According to Grant, he understood these letters to assure him of a job as both a school-bus driver and a custodian for the upcoming school year.  Grant argued that his employment as a school-bus driver and a custodian were linked from the beginning.  That is, for over two decades Grant was a school-bus driver during the day and a custodian after his afternoon route ended.

Peru Schools argues that the letters do not apply to Grant's employment as a custodian because the letters begin by specifically thanking Grant for his services "as a bus driver."  But even if the letters provided clear job security as a custodian, which we doubt, Peru Schools argues that there is no evidence that Grant relied on the letters to his detriment, which is a necessary element of promissory estoppel.  Indeed, the only evidence that Grant put forward of detrimental reliance was that "he believed he would be employed as a custodian based on the letter received from the school superintendent each year."  Appellee's Br. p. 29; Tr. p. 62.  From this testimony, Grant argues that a reasonable conclusion is that his "employment as a school custodian could not be terminated without cause."  Appellee's Br. p. 27.

We, however, agree with Peru Schools and find that the record is devoid of any meaningful evidence that Grant relied to his detriment on the letters.  *See Orr*, 689 N.E.2d at 718 ("[The employees] also have not asserted the doctrine of promissory

---

[3] Peru Schools explains that the purpose of these letters was to disqualify Grant from receiving unemployment compensation as a school-bus driver during the periods when school was not in session. *See* Ind. Code § 22-4-14-7(a)(2).

estoppel, and, in any event, the record is devoid of any meaningful evidence that they relied to their detriment upon the Handbook or any other statements by [the employer].”). There is no evidence that Grant turned down other work or did not seek other work *because* the letters allegedly assured him of continued employment as a custodian. *Cf. Pepsi-Cola Gen. Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 699 (Ind. Ct. App. 1982) (“We have no difficulty in finding that Woods has a right of action under promissory estoppel; clearly Woods quit her former employment in reliance upon a promise of employment with Pepsi.”). Because there is no substantial evidence to support detrimental reliance, we conclude that the trial court erred in denying Peru Schools’ motion for judgment on the evidence on this issue. Accordingly, Grant is not entitled to defeat the presumption of at-will employment for his job as a custodian through the doctrine of promissory estoppel; Peru Schools could fire Grant as a custodian for any reason or no reason at all, except race, religion, color, sex, disability, national origin, or ancestry, which are claims he does not make. *See Filter Specialists, Inc. v. Brooks*, 906 N.E.2d 835, 838 (Ind. 2009).

### B. Bus Driver

We, however, reach a different result with regard to the termination of Grant’s employment as a school-bus driver. Because Peru Schools only raises this issue using the summary-judgment standard, we do not address this issue using the motion-for-judgment-on-the-evidence standard.

Grant had a contract with Peru Schools for the 2007-08 school year as a school-bus driver. The contract provided, in part: “Failure of Driver to comply with the terms of

this contract, including all terms and conditions incorporated by reference, shall be deemed cause for dismissal at the option of Employer."[4] Appellant's App. p. 21. Peru Schools terminated Grant in November 2007, six months before the contract ended. If there is an employment contract for a definite term, and the employer has not reserved the right to terminate the employment before the conclusion of the contract, the employer generally may not terminate the employment relationship before the end of the specified term except for cause or by mutual agreement. *Orr*, 689 N.E.2d at 717; *see also* 30 C.J.S. *Employer-Employee* § 40 (2007) ("Where a contract of employment is for a definite term, it may not be terminated at an earlier period, except for cause or by mutual agreement, unless the right to do so is reserved in the contract. The right to terminate an employment contract for a definite term for cause is implied even if it is not expressly stated in the contract." (footnotes omitted)).

The facts in this case were heavily disputed regarding whether cause existed to terminate Grant's school-bus driver's contract. The memorandum that Hall created contemporaneously with the school-board meeting says that Grant was fired because he started the bus early unnecessarily to waste fuel and had not been truthful in denying that he did not start the bus that early. Appellant's App. p. 150. In fact, Grant was merely warned during the meeting not to leave his keys in the school bus again. *Id.* at 149. But later, Peru Schools argued that it fired Grant for leaving the keys in the bus and it really did not matter why he was fired. *See* Appellant's Br. p. 28 ("One could only conclude

---

[4] Although Grant argues on appeal that the handbook was not signed by the superintendent, Grant did not raise this issue at the summary-judgment stage. *See Huntington v. Riggs*, 862 N.E.2d 1263, 1269 (Ind. Ct. App. 2007) ("[I]ssues not raised before the trial court on summary judgment cannot be argued for the first time on appeal and are therefore waived."), *trans. denied*.

16

that Grant failed to secure the bus, a violation of his contract, or he started the bus himself and lied to his employer when he refused to admit it."); Appellant's Reply Br. p. 13 n.1 ("Peru School Corporation does not contest [that there is no policy regarding when to start school buses in the morning], *but argues [that it] is not relevant because Grant was not terminated for starting the bus early*. One of the grounds the administration recommended his termination was that he lied when he denied starting it or knowing how it got started early. As stated earlier, the administration also concluded he had breached his contract by leaving his keys in the bus and failing to secure it." (emphasis added)).

It, however, does matter why Grant was fired. When there is an employment contract for a definite term, the employer may not terminate the employment relationship before the end of the specified term except for cause. Based on the designated evidence, one could reasonably conclude that Grant was fired not because he left the keys in the bus but rather because he started the bus early and lied to his employer about it. And if that is the reason, then a genuine issue of material fact existed because Grant has always denied starting the bus early. Accordingly, we conclude that the trial court properly denied Peru Schools' motion for summary judgment on this issue. Because the jury ultimately found that Peru Schools wrongfully terminated Grant's employment as a school-bus driver, we now proceed to the issue of damages.

### 3. Damages

Peru Schools contends that the trial court erred in admitting evidence, including Exhibit 14, of Grant's salary as a school-bus driver and a custodian through the 2020-21

17

school year, which is when Grant will turn sixty-five years old.[5]  Because we found above that the trial court should have granted judgment on the evidence for Peru Schools regarding termination of Grant's employment as an at-will custodian, Grant is only entitled to damages regarding termination of his employment as a school-bus driver for the contract term of August 15, 2007, to May 28, 2008.

An employee discharged in breach of an employment contract for a definite term is entitled to recover his or her salary for the balance of the term, reduced by what the employee, through reasonable efforts, might have earned in other employment after discharge and before expiration of the contract term.  *Woods*, 440 N.E.2d at 699; 12 I.L.E. *Employment* § 43 (2009).  In addition,

> when an employee is wrongfully discharged under a contract for a definite term, the basic measure of damages, subject to any requirement of mitigation, is the wages that would have been earned during the unexpired portion of the term; the employee is normally entitled to receive only what he or she would have received if the contract had been carried out according to its terms, provided that the amount of lost wages is reasonably certain and proven to have been the result of the employer's breach, and cannot generally recover for any claimed loss of income occurring after expiration of the contract term.

24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 66.2 (4th ed. 2002) (footnotes omitted); *see also* 30 C.J.S. *Employer-Employee* § 124 (2007) ("An employee discharged without good cause prior to the expiration of a definite term contract can recover damages. . . .  The real measure of the employee's damages is the loss actually sustained by him or her by reason of the wrongful discharge.  Broadly

---

[5] Contrary to Grant's argument on appeal, Peru Schools is not arguing excessive damages; therefore, it was not required to file a motion to correct error pursuant to Indiana Trial Rule 59(J).

18

speaking, this loss consists of the stipulated wages for the unexpired term." (footnotes omitted)).

Applying these principles to the case at hand, it is clear that evidence of wages that Grant would have earned after the 2007-08 school year cannot be considered. The evidence shows that had Grant not been terminated, he would have earned $4222.82 for the balance of his contract term as a school-bus driver. The evidence also shows that Grant received $1800 in unemployment compensation during this time. Accordingly, Grant is entitled to recover $2422.82 from Peru Schools for his wrongful termination as a school-bus driver.

## II. Grant's Cross-Appeal

Grant raises several issues in his cross-appeal; however, we do not have to reach their merits given our resolution of the above issues.

First, Grant contends that he was entitled to the information given to the school board during the executive session concerning his performance or misconduct because such information is not privileged under Indiana law. However, we reversed the trial court's denial of Peru Schools' motion for judgment on the evidence regarding termination of Grant's employment as a custodian because there was no substantial evidence of detrimental reliance; therefore, the only employment that matters now is his employment as a school-bus driver. And because the jury found that Peru Schools wrongfully terminated Grant's employment as a school-bus driver, whatever information that was given to the school board during the executive session concerning his

19

performance or misconduct is not determinative. Accordingly, we do not need to decide whether such information is privileged.

Second, Grant contends that Peru Schools violated Indiana's Open Door Law, Indiana Code chapter 5-14-1.5, because it essentially "checked the wrong box." That is, Peru Schools indicated that the purpose of the executive session was "[t]o discuss, prior to any determination, that individual's status as an employee, student, or independent contractor who is a physician" instead of "[t]o receive information concerning the individual's alleged misconduct," which Grant argues more appropriately described what must have happened during the executive session. Appellant's App. p. 64; Appellee's App. p. 108; *see also* Appellee's App. p. 107 (noting that the purpose of the executive session is "[t]o discuss an individual's status as an employee"). For the same reason as above, even if Peru Schools "checked the wrong box," the jury found that Peru Schools wrongfully terminated Grant's employment as a school-bus driver. Therefore, given our resolution of the termination of Grant's employment as a custodian, there is no harm.

Finally, Grant contends that the trial court erred in excluding Exhibit 15 from evidence. Exhibit 15 is a certified copy of administrative law judge's decision in Grant's unemployment case. *See* Appellee's App. p. 140-42. Grant argued that the document was admissible to impeach Hall's credibility regarding why he was fired. The trial court excluded it, however, because "what I keep circling back to um is . . . that I believe that the prejudicial impact of having the um . . . decision of the administrative law judge in front of this jury outweighs any probative value." Tr. p. 130 (ellipses in original). Again, because the jury found that Peru Schools wrongfully terminated Grant's employment as a

20

school-bus driver and given our resolution of the termination of Grant's employment as a custodian, we need not reach the issue because no harm has resulted from the trial court's exclusion of this document.

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER, J., and BARNES, J., concur.